IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

F.J. BORESEK, TRUSTEE OF THE F.J.
BORESEK TRUST,

        Plaintiff,

        v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, FARM SERVICE
AGENCY; CHRISTIAN BUSSMAN and
DEANA BUSSMAN,

        Defendants.

Case No. 6:12-cv-02138-MC

OPINION AND ORDER

MCSHANE, Judge:

        This action deals with the priority of competing mortgages. The main question presented

is whether the United States has waived sovereign immunity from an equitable subrogation claim

against a senior government lien when that government lien is not a tax lien. This specific issue

appears to be a matter of first impression in any court, state or federal. Because the caselaw

indicates the United States has in fact waived such claims, plaintiff's motion for summary

1 – OPINION AND ORDER

judgment, ECF No. 29, is GRANTED in part. Defendants' motions, ECF No. 27 and 35, are DENIED.

## BACKGROUND

Defendants Christian and Deana Bussman own a house and a separate 50 acre cranberry farm in Coos Bay. When buying the house, the Bussmans obtained two loans from a bank, both secured by a deed of trust on the house. The bank recorded the mortgages.

In 2000, the Bussmans obtained several loans, secured with mortgages on both the house and the farm, from defendant United States Department of Agriculture, Farm Service Agency (FSA). The FSA recorded those mortgages.

The Bussmans ran into financial difficulties. They obtained a loan from plaintiff F.J. Boresek, Trustee of the F.J. Boresek Trust. On their applications to Boresek, the Bussmans neglected to mention the FSA loans. Boresek hired a title company to run a preliminary title report. The report did not mention the FSA loans. In fact, the report only mentioned the smaller of the original loans the Bussmans obtained to first buy the house. The report did not mention the larger of the original home loans, nearly $150,000 by that time.

Relying on the report, Boresek figured he could pay off the original loans and lend the Bussmans $250,000 on a 12% interest only loan. As Boresek was unaware of the recorded FSA mortgages, Boresek believed that if the Bussmans defaulted, he would have a first position security interest. Boresek made the loan and recorded the mortgage (secured by the home only). Unfortunately for Boresek, the FSA recorded its loans years earlier and Boresek in fact was second-in-line, behind about $400,000 in FSA loans.

Two years later, in 2009, tthe Bussmans needed to refinance the FSA loans. The FSA refinanced all the loans, added the accumulated interest into the principal, and then recorded

another mortgage. The 2009 notes specifically state they are not paying off the 2000 loans, and are not changing the priority of the 2000 recorded mortgage, but are simply refinancing. The 2000 loans and the 2000 mortgage contain language stating this is permissible. Additionally, specific Oregon statutes explicitly allow this sort of refinancing without affecting the priority of the previously recorded mortgage.

A few years later, the Bussmans defaulted on the Boresek loan and Boresek attempted a non-judicial foreclosure of the home. The FSA alerted Boresek to its senior interests.

Boresek filed this action bringing three claims. First, Boresek seeks to quiet title, arguing its interest has priority over the FSA's interests. In the alternative, Boresek brings claims for equitable subrogation and marshaling. The subrogation claim is based on the equitable doctrine that one who makes a loan intending to pay off prior interests, who is unaware of other interests, should be placed in the shoes of the interest they paid off. The third claim is for equitable marshalling. As the FSA loans are secured by the home and the farm, and the Boresek loan is secured solely by the home, Boresek requests an order that the FSA take its recovery first from the farm and then, if necessary, from the home.

## STANDARD OF REVIEW

The court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party.

*Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999))

## DISCUSSION

Sovereign immunity limits a district court's subject matter jurisdiction over actions brought against the United States. *Vacek v. United States Postal Service*, 447 F.3d 1248, 1250 (9th Cir. 2006). The United States "is immune from suit unless it has expressly waived such immunity and consented to be sued." *Dunn & Black, P.S. v. United States,* 492 F.3d 1084, 1087-88 (9th Cir. 2007). The scope of any waiver of sovereign immunity is to be strictly construed in favor of the United States. *Id.* at 1088 (citation omitted). The party suing the United States bears the burden of demonstrating the existence of "an unequivocal waiver of immunity." *Holloman v. Watt*, 708 F.2d 1399, 1401 (9th Cir. 1983).

28 U.S.C. § 2410(a)(1) states:

[T]he United States may be named a party in any civil action or suit in any district court, or in any State court having jurisdiction of the subject matter [] to quiet title to . . . real or personal property on which the United States has or claims a mortgage or other lien.

The parties agree the United States has waived sovereign immunity as to the quiet title claim. They disagree as to whether sovereign immunity bars the equitable subrogation or marshaling claims.

### I. Quiet Title

"In an action to quiet title, plaintiffs must prove that they have a substantial interest in, or claim to, the disputed property and that their title is superior to that of defendants." *Howe v. Greenleaf*, 260 Or. App. 692, 700 (2014) (internal quotations omitted). It is undisputed that the FSA recorded its interests before Boresek recorded his interest. Boresek argues that the parties intended that the 2009 notes extinguished the 2000 notes because the FSA assigned a new loan

number with the 2009 refinancing and then recorded a new mortgage. Boresek argues the 2000

mortgage must be extinguished as a matter of law, and the Boresek mortgage is actually senior to

the FSA mortgage. Boresek argues the 2009 notes were a "novation" of the earlier loans.

A "novation" is "the substitution by mutual agreement of one debtor or of one creditor

for another, whereby the old debt is extinguished, or the substitution of a new debt or obligation

for an existing one, which is thereby extinguished." *Credit Bureaus Adjustment Dept., Inc. v.*

*Cox Bros.*, 207 Or. 253, 257 (1956) (quoting 66 C.J.S., Novation, § 1 a, 681). Whether a

novation occurred depends on the intentions of the parties. *Id.* at 258. Absent "a clear and

definite intention on the part of all concerned to extinguish the old obligation by substituting the

new one therefore, a novation is not effected." *Id.* Boresek bears the burden of demonstrating the

defendants intended that the 2009 loans were a novation of the 2000 loans. *Id.*

The language of the FSA notes and mortgages clearly state the 2009 loans are not meant

to impact the priority of the 2000 mortgages. The 2009 note states that the note is simply a

"rescheduling" of the earlier notes. Thompson Decl., Ex. E, 1 ¶ 9. Specifically, it states "this

note is given to . . . reschedule . . . but not in satisfaction of, the unpaid principal and interest on

the [2000 notes]." *Id.* at ¶ 17. Regarding the underlying security interest, the note states:

> Security interests taken in connection with the loans evidenced by these described
> notes and other related obligations are not affected by this consolidation, write
> down, rescheduling, or reamortization. These security interests shall continue to
> remain in effect and the security given for the loans evidenced by the described
> notes shall continue to remain as security for the loan evidenced by this note, and
> for any other related obligations.

*Id.* at ¶ 18. In addition to the express language of the 2009 notes indicating they were not

intended as a novation of the earlier obligations, the Bussmans testified the 2009 loans were

simply a refinance. Finally, Oregon Revised Statute 86.095(1) specifically allows parties to

adjust the interest rate or extend the term of a loan without affecting the priority of a lien. In this

5 – OPINION AND ORDER

instance, defendants did just that. It is clear the 2009 loans were simply intended to refinance the 2000 loans.

Recording statutes are intended to provide notice to persons buying property or persons intending to loan funds that will be secured by property. Because the FSA recorded the 2000 and 2009 mortgages, a person checking the land records could think there were separate mortgages and conclude the property was encumbered with twice the amount of the actual debt secured by the property. Boresek appears to argue the 2009 mortgages provided too much notice and therefore the court must order the 2000 loans extinguished. Although the FSA was not required to record the 2009 mortgages, that does not mean the FSA and the Bussmans clearly intended the 2009 loans to extinguish the 2000 loans. An unnecessary recording of a mortgage does not obligate a court to order a prior loan extinguished. Boresek has not met its burden demonstrating defendants intended the 2009 loans as a novation.

The FSA's motion for summary judgment on Boresek's claim to quiet title is GRANTED.

## II. Equitable Subrogation

A party bringing an equitable subrogation claim admits their title is subordinate but argues equity demands the court place them in front of the party with priority. In *Dimeo v. Gesik*, 164 Or. App. 567, 571 (1999), the court provided a concise description of the doctrine of equitable subrogation:

> If the holder of a mortgage takes a new mortgage as a substitute for a former one, and cancels and releases the latter in ignorance of the existence of an intervening lien upon the mortgaged premises, although such lien be of record, equity will, in the absence of the intervening rights of third parties, restore the lien of the first mortgage and give it is original priority.

*Id.* (quoting *Pearce v. Buell*, 22 Or. 29 (1892) (internal brackets omitted)).

Equitable subrogation seeks to avoid a windfall to the junior lienholder, who knew all along it held a junior lien and moved to a senior position only through the excusable neglect of the party making the loan. Equitable subrogation ordinarily will not prejudice any party because if the party seeking equitable subrogation knew of the intervening lien, it never would have made the loan to pay off the original senior lien in the first place. In that instance, the party seeking to avoid equitable subrogation—here the FSA— would have simply remained in a junior position all along. At the time it made the 2000 loans, the FSA knew it held second position security interests.

Other than the sovereign immunity issue, *Dimeo* is largely analogous to our facts here. Two trust deeds encumbered a property. The owner sold the property subject to the two trust deeds. The new owner then received a loan from the plaintiff, secured by a trust deed. The defendant bank then offered the owner a home equity line of credit, even though plaintiff's trust deed appeared on the preliminary title report. Defendant instructed the title company that the loan could be made as long as plaintiff's trust deed was subordinated to the defendant's trust deed or removed altogether. In other words, the defendant only authorized the loan to occur on the condition that its interest was the senior interest on the property. *Id.* at 569-70. The title company representative assured defendant that would occur.

The final title report did not show the plaintiff's interest, instead showing defendant's trust deed in first position. The owner used the funds in part to pay off the original two trust deeds (in front of the plaintiff's). Like FSA's interest, the plaintiff's interest in *Dimeo* jumped to first position, followed by the interest of the defendant bank.

The plaintiff filed an action for judicial foreclosure, naming the defendant bank. The bank sought equitable subrogation, arguing it reasonably believed plaintiff's lien had been

discharged. The trial court concluded defendant's reliance on the title report was not reasonable and granted plaintiff's motion for summary judgment. Plaintiff argued the bank had actual knowledge of its lien and was negligent in releasing the funds without following up. The Court of Appeals reversed.

The court noted equitable subrogation only applies when "the lender proves that it was ignorant of the existence of the intervening lien and that its ignorance was not a result of inexcusable negligence." *Id.* at 571. Although the preliminary title report gave the defendant actual knowledge of the liens, the court concluded a question of fact existed as to whether defendant was negligent in relying on the final title report in releasing the funds. Although plaintiff argued the subsequent title report could not erase defendant's actual knowledge of the intervening liens, the defendant argued "it is routine for lenders to rely on final title reports that provide different information from what was provided in a preliminary title report." *Id.* at 572. The court stated:

> It may be appropriate in certain circumstances to rely on information in a subsequent report. We are not prepared to say that it is *always* and in *all* circumstances appropriate to do so, as a matter of law. In particular, we cannot say that it is always appropriate to rely on a subsequent title report that makes no reference to the disposition of intervening liens that had been reported previously. That said, we are likewise unprepared, on this record, to say that, as a matter of law it was *not* reasonable for [defendant] to have relied on the final title report. The issue simply is not one that can be resolved by way of summary judgment, at least not on a record that contains no information about what is commercially reasonable under these circumstances.

*Id.* (emphasis in original).

The parties dispute whether "actual ignorance" of the FSA loans is required. Boresek argues it need only prove it acted in a commercially reasonable manner to bring a claim of equitable subrogation. This dispute arises based on discovery Boresek turned over indicating its

agent was aware of the Bussmans' debt to FSA. Even if this document is admissible, the document indicates the FSA debts are unsecured. Although Boresek may have known of the Bussman's FSA debts, the real issue is whether Boresek "proves it was ignorant of the existence of the intervening lien and that its ignorance was not a result of inexcusable neglect. *Id.* at 571. The document simply lists a FSA debt, which is not a "lien."

*Dimeo* leads to the conclusion that absent an issue of sovereign immunity, the facts here fall squarely into a situation where equitable subrogation is an available remedy. As described below, there remains a question of fact as to whether Boresek acted in a commercially reasonable matter in relying on an inaccurate preliminary title report. Although *Dimeo* would be controlling in a case without sovereign immunity issues, this case involves that important issue. Therefore, I turn to the question of whether the United States has waived sovereign immunity as to Boresek's equitable subrogation claim.

As noted, 28 U.S.C. § 2410(a)(1) states, "[T]he United States may be named a party in any civil action or suit in any district court, or in any State court having jurisdiction of the subject matter [] to quiet title to . . . real or personal property on which the United States has or claims a mortgage or other lien."

Each case Boresek cites allowing equitable subrogation claims to proceed against the United States involves tax liens. The FSA argues the equitable subrogation waiver is limited to tax cases and does not apply to equitable subrogation claims not involving IRS liens. I see no reason not to extend the waiver of sovereign immunity to equitable subrogation claims outside of the tax context.

26 U.S.C. § 6323(i) in the tax code outlines several special rules for determining the priority and enforceability of tax liens placed on a property by the IRS. Section 6232(i)(2), titled

"Subrogation," states "Where, under local law, one person is subrogated to the rights of another with respect to a lien or interest, such person shall be subrogated to such rights for purposes of any lien imposed by [certain tax regulations]."

Although section 6323 waives sovereign immunity to equitable subrogation claims against tax liens, it does not provide a federal court subject matter jurisdiction over those claims. Most plaintiffs challenging tax liens use section 2410(a)(1) as a jurisdictional hook. The question in those cases is whether equitable subrogation claims fall under a claim to quiet title under section 2410(a). If not, the federal court lacks subject matter jurisdiction over the claim. Most courts examining the issue conclude equitable subrogation claims challenging the priority of tax liens are in fact claims to quiet title under section 2410(a)(1).

There are no cases, state or federal, concluding section 2410(a)(1) contains an express waiver of sovereign immunity for equitable subrogation claims outside of the tax lien context. That being said, there are also no cases saying section 2410(a)(1) does *not* contain an express waiver of sovereign immunity for equitable subrogation claims outside of the tax lien context. As noted, the FSA argues that with the exception of tax liens, the government has not waived sovereign immunity as to claims of equitable subrogation.

The FSA relies largely on two cases, *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999) and *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305 (9th Cir. 2011). Neither case is instructive here. *Blue Fox* involved a subcontractor on an army project seeking an equitable lien on funds held by the army. The subcontractor sought a lien on government property after the contractor went bankrupt before paying the subcontractor. The alleged waiver was not under 28 U.S.C. § 2410(a), but under the Administrative Procedures Act (APA) which allows actions against the USA in certain circumstances for "relief other than money damages."

*Blue Fox*, 525 U.S. at 260. The issue there was whether an equitable lien against the army itself was "relief other than money damages." The Court concluded the equitable lien was a claim for "money damages" falling outside of the APA's waiver of sovereign immunity. *Id.* at 263. That conclusion was consistent with longstanding precedent that "sovereign immunity bars creditors from attaching or garnishing funds in the Treasure, or enforcing liens against property owned by the United States." *Id.* at 264 (internal citations omitted).

Boresek alleges waiver of sovereign immunity not under the APA, but under 28 U.S.C. § 2410(a). Additionally, this action does not deal with a party attempting to enforce a lien on property owned by the United States. We deal not with any property owned by the United States, but instead with the priority of mortgages, some of which are held by the FSA. *Blue Fox* simply does not apply.

Likewise, *Lumbermens Mut.* is not helpful. The plaintiff in *Lumbermens Mut.* was a surety who brought equitable subrogation claims in the Court of Federal Claims (under the Tucker Act) against the government. 654 F.3d at 1307. The surety posted a bond for a contractor's work on a navy project. The contractor defaulted after completing 20% of the work (but being paid for 40%). The surety had to hire another contractor to complete the work and brought an equitable subrogation claim against the government, in part for failing to follow federal law limiting contract payouts to work performed. The court noted the Tucker Act provided the Court of Federal Claims jurisdiction over only express contracts with the government or contracts "implied in fact" with the government. *Id.* at 1316. As the surety proceeded on an "implied in-law contract theory," the court concluded it lacked jurisdiction. *Id.*

Boresek argues sovereign immunity is waived under 28 U.S.C. § 2410(a), not the Tucker Act. And while *Lumbermens* contains language stating the government has not waived sovereign

immunity to contracts implied by state law absent an express waiver, this case involves 28 U.S.C. § 2410(a)(1), which contains an express waiver for claims to quiet title to property in which the United States has a lien.

The FSA's best argument appears to be the fact that there are no cases concluding the United States has waived sovereign immunity as to equitable subrogation claims outside of the tax lien arena. While that may be so, looking into the analysis of those tax lien cases is instructive as those cases examine the reach of section 2410(a)(1) to determine whether federal courts have subject matter jurisdiction over equitable subrogation claims.

In 1960, the Supreme Court discussed the history of 28 U.S.C. § 2410 and 26 U.S.C. § 7424 (in the tax code) in a case involving state law foreclosures on properties encumbered with tax liens. *United States v. Brosnan*, 363 U.S. 237. The Court detailed how in 1924, Congress passed section 26 U.S.C. § 7424 allowing a senior lienholder to bring a civil action against the United States to determine the priority of competing liens. *Id.* at 243-44. Congress enacted the statute because prior to that time, due to sovereign immunity, a senior lienholder had no way to extinguish junior tax liens held by the United States (as state law requires all parties with an interest in property be joined in an action for foreclosure). *Id.* at 243. Then, in 1931, for similar reasons, Congress passed section 2410, which is the statute at issue in this case and is similar to section 7427 except it allows actions to quiet title to property on which the United States holds any lien, whether or not a tax lien. *Id.* at 244-45.

The Court noted "These statutes on their face evidence no intent to exclude otherwise available state procedures. Their only apparent purpose is to lift the bar of sovereign immunity which had theretofore been considered to work a particular injustice on private lienors." *Id.* at 247. In discussing the legislative history of the statutes, the Court pointed to a 1941 letter sent by

then Attorney General Jackson to the Chairman of the Senate Judiciary Chairman. Section 2410

as originally proposed did not contain a waiver for claims to quiet title. In his letter, Jackson

requested section 2410 be amended to include actions to quiet title:

> In many instances persons acting in good faith have purchased real estate without
> knowledge of the Government lien *or in the belief that the lien had been*
> *extinguished.* In other instances, mortgagees have foreclosed on property and have
> failed to join the United States. It appears that justice and fair dealing would
> require that a method be provided to clear real-estate titles of questionable or
> valueless Government liens. Accordingly, I suggest that the bill be amended by
> inserting the phrase 'to quiet title or' between the words 'matter' and 'for the
> foreclosure of' in line 4 of page 2 of the bill.

*Id.* at 250 (Emphasis added).

The Court then determined whether the two cases there—one a judicial foreclosure and

one a non-judicial foreclosure—constituted instances in which the government had waived

sovereign immunity. In one case, the government did not receive advance notice of the sale. Still,

the Court concluded Congress had expressly waived sovereign immunity in both instances, and

that junior federal tax liens could be extinguished via state law, even though state laws vary. *Id.*

at 116-17.

One year later, the Ninth Circuit discussed *Brosnan* in *United States v. Coson*, 286 F.2d

453 (1961), another tax lien case. Coson sought a declaration that he owned the property and that

the government did not have a valid tax lien on the property. Although *Coson* is a tax case,

plaintiff alleged jurisdiction under section 2410(a)(1), the section at issue here. The court had to

determine whether the waiver of sovereign immunity to claims to quiet title contained in section

2410(a)(1) extended to Coson's challenge there, which was not in fact a traditional claim to

"quiet title" under state law.

In discussing whether the action fell under section 2410(a)(1) as one "to quiet title" to property on which the United States held a lien, the court noted "quiet title" as used in that section did not refer to the "limited sense in which that term is sometimes used," but rather "comprehends a suit to remove a cloud upon the title of a plaintiff." *Id.* at 457. The court relied not only on the text of section 2410, but also specifically on the legislative history behind the addition of "quiet title" into 2410(a). *Id.* The court explicitly mentioned the letter of then Attorney General Jackson and noted the "quiet title" amendment was inserted pursuant to the recommendation in that letter. *Id.* The court concluded "it is clear that the waiver of immunity [in section 2410(a)] exists for the specific type of suit here brought, namely, one to remove a cloud on the title." *Id.* Colson did not bring a claim for equitable subrogation. Instead, he challenged the validity of the tax lien, in part on the basis that he did not owe the tax (which was owed by a corporation). Still, the case is instructive as it examines the reach of section 2410's quiet title waiver beyond claims explicitly bringing claims to "quiet title" under state law.

In *Progressive Consumers Fed. Credit Union v. United States*, 79 F.3d 1228 (1st Cir. 1996), a bank brought an equitable subrogation claim under Massachusetts law seeking a declaration that its later-filed lien had priority over an IRS lien. The court had to determine if that claim constituted a claim to quiet title under section 2410(a). *Id.* at 1231.

The court agreed with the Ninth Circuit's conclusion in *Coson* that the text and history of section 2410(a) support the view that "quiet title" in that section referred not to a limited and formalistic claim to quiet title, but to an action brought to remove a cloud upon title. *Id.* Again, the court specifically referenced the letter from then Attorney General Jackson. *Id.*

The government argued that plaintiff could not bring a "quiet title" action as defined in section 2410(a)(1) because, under Massachusetts law, a party bringing a claim to quiet title must

have actual possession of the property, which the plaintiff did not have. Therefore, the

government argued plaintiff was not bringing a claim to "quiet title" after all and Congress did

not waive sovereign immunity to plaintiff's equitable subrogation claim. The government also

argued claims to determine the priority of competing liens must be brought as a foreclosure

action (available under section 2410(a)(2)), because quiet title claims under Massachusetts law

could extinguish liens but not determine priority. Because a party seeking foreclosure under

section 2410(a) must seek a judicial sale under 2410(c), and because plaintiff there did not seek a

judicial sale (but only a priority determination), the government argued plaintiff's specific relief

or claim did not precisely fit anywhere in section 2410(a). Therefore, the government argued

there was no express waiver of sovereign immunity.

Citing Fifth Circuit cases, the court rejected the government's arguments. Those Fifth

Circuit cases examined section 2410(a)(1) claims to quiet title and determined the relief sought

in such claims was a "judicial determination of the *validity and rank of the competing liens*." *Id.*

at 1232 (emphasis in original) (quoting *Kasdan v. G.W. Zierden Landscaping, Inc.,* 541 F.Supp.

991, 995 (D. Md. 1982)). *Kasdan* rejected the argument that quiet title actions must seek to

extinguish the government's lien, noting a section 2410(a)(1) claim to quiet title actually seeks

"a determination that a tax lien does not exist, has been extinguished, or is inferior in rank." 541

F.Supp. at 995. The court in *Progressive Consumers* emphasized the language "or is inferior in

rank," and cited another Fifth Circuit case for the proposition that quiet title claims encompass

claims regarding priority of competing liens:

> [W]e think that section 2410, an integral part of the Judicial Code rather than an
> administrative mechanism of the tax structure, establishes a specific jurisdiction
> for these suits as bills to quiet title or for foreclosure of the private lien. The
> jurisdiction does not depend on the specific relief sought, [e.g.] foreclosure.
> Rather, it rests on the existence of the traditional controversy in which a private

> party asserts an ownership [interest] which is superior to the claimed lien of the
> United States government.

79 F.3d at 1232 (quoting *Estate of Johnson*, 836 F.2d 940, 945 (5th Cir. 1988)). The court noted

other courts "have adopted this logic," citing a district court case that concluded challenges to the

priority of competing liens fell under "quiet title" actions of section 2410(a). *Id.* (citing

*Brightwell v. United States*, 805 F.Supp. 1464 (S.D. Ind. 1992)). Noting its conclusion was

"Consistent with the broad construction accorded section 2410's quiet title provision by a

number of other jurisdictions," the court held "that section 2410(a)(1) controversies encompass

disputes concerning both the 'validity and priority of liens,' as distinguished from actions

seeking 'their extinguishment in a manner not permitted by the statutes.'" *Id.* at 1233 (quoting

*Remis v. United States*, 273 F. 2d 293, 294 (1st Cir. 1960)).

The clear weight of authority supports a broad interpretation regarding claims to "quiet

title" under section 2410(a)(1). This broad interpretation includes claims to determine the

priority of competing liens, and includes equitable subrogation claims. *See Mort v. United States*,

86 F.3d 890 (9th Cir. 1996); *Progressive Consumers Fed. Credit Union*, 79 F.3d 1228; *Hussain

v. Boston Old Colony Ins. Co.*, 311 F.3d 623, 629 (5th Cir. 2002) (Congress "specifically passed

[section 2410(a)] to waive the sovereign immunity of the United States so that private parties

could get the government into court when necessary to quiet title or resolve priority of liens or

mortgages."); *Estate of Johnson*, 836 F.2d 940; *Brightwell*, 805 F. Supp. 1464. Only the

Eleventh Circuit takes a narrow view of the "quiet title" waiver of sovereign immunity contained

in section 2410(a). *See Raulerson v. United States*, 786 F.2d 1090, 1091 (1986) ("section 2410

waives sovereign immunity only in *actual* quiet title actions, not suits analogous to quiet title

actions.") (emphasis in original)). The entirety of the discussion in *Raulerson* is contained in one

brief paragraph. Considering the weight of opposing authority in the 30 years since *Raulerson*,

16 – OPINION AND ORDER

and considering the Ninth Circuit's opinion to the contrary in *Coson, Raulerson* is not persuasive.

Like the vast majority of other courts to examine the scope of waiver contained in section 2410(a)(1), I conclude the waiver extends to cases seeking a judicial determination of the validity and priority of competing liens. As there is no reason to limit those cases solely to cases involving tax liens, I conclude section 2410(a)(1)'s waiver of sovereign immunity to claims of equitable subrogation extends to all cases in which the government holds a competing lien, whether or not the lien is a tax lien.

The above conclusion does not resolve the pending motions. The FSA argues allowing equitable subrogation in this instance will unfairly prejudice the FSA while letting the negligent title company off the hook. The Ninth Circuit, however, has rejected this same argument when made by the IRS in *Mort*, a tax lien case. There, the court rejected the IRS's argument that equitable subrogation would "work an injustice" on its rights. Finding the IRS's argument "wholly without merit," the court explained:

> At the time the IRS filed its tax lien, the tax lien was subordinate to the Kern mortgage. If the Morts are equitably subrogated to the priority position of the Kern mortgage, the IRS will be in the same position it was in at the time the tax lien was filed. If equitable subrogation is denied, however, the government will receive a windfall, moving up to a better position than it originally had. Under these circumstances, there is no basis for the government's argument that it will suffer harm from equitably subrogating the Morts' interest.

86 F.3d at 895. As in *Mort*, allowing equitable subrogation here will merely place the FSA in the position it was in before Boresek paid off the original loans.

The FSA's argument that the negligent title company, not Boresek, is the real party in interest also fails. The FSA argues that if anyone should pay here, it is the title company "who caused this mess in the first place." *Mort*, however, also dispatches with that argument. The court

rejected the government's argument that the title company would be unjustly enriched. *Id.* The

court noted the lien holders were the plaintiffs, not the title company, and that the title company

itself was not seeking equitable subrogation. *See id.* at n.5 ("The IRS's argument that the title

insurer is the real party of interest in this case is also without merit. There is no evidence of

collusion between the Morts and Fidelity."). That reasoning applies equally well here. Boresek is

the named plaintiff. Even though it appears the title company is directing this litigation through a

subrogation agreement with Boresek, the fact remains that Boresek is the named party and it is

Boresek's interest at issue. The FSA has failed to present any "evidence of collusion" between

Boresek and the title company.

The Seventh Circuit used the "no evidence of collusion" language from *Mort* in

distinguishing the facts there, where the attorney at oral argument conceded the negligent title

company was paying the costs of litigation (brought in the name of the lien holder). *First

Federal Sav. Bank of Wabash v. United States*, 118 F.3d 532, 534 (1997). The court noted

Indiana courts were "reluctant to invoke the doctrine of equitable subrogation in cases where to

do so would benefit a negligent title insurer." *Id.* The court concluded:

> Any remaining doubt we might have as to how an Indiana court would rule is
> dispelled by our own assessment of the equities. We can assume that the title
> insurer, a profit maximizer like any other business, would agree to pay First
> Federal's legal fees only if the expected savings, in the form of reduced overall
> payouts resulting from successful litigation, exceeded the legal costs of pursuing
> these actions. The flip side of this calculus is that the government's overall
> recovery in these cases is reduced both by adverse judgments and by the costs of
> additional litigation. In other words, the fee-paying agreement amounts to an
> attempt by the insurer to shift some of its expected payout cost to the public fisc.
> It may be that a portion of this savings is passed along to the bank in the form of
> reduced insurance costs. Either way, we are not inclined in this case, where an
> equitable remedy is sought, to elevate form over substance by disregarding the
> insurer's interest in the outcome of this litigation.

*Id.* at n.3.

Although the FSA quotes the above language, the "collusion" language in *Mort* referred not to the insurer paying for the litigation, but to a prearranged agreement between the plaintiff and the insurer to purposefully overlook the government's interest. There is no reason to think the Ninth Circuit equates "collusion" with paying for litigation.

An unpublished Ninth Circuit Bankruptcy Appellate Panel decision came to the same conclusion. *See In re Tiffany*, 2007 WL 7541013 *11. The defendant there argued equitable subrogation was unavailable because the negligent title company was paying for the litigation. The court stated "collusion" referred to in *Mort* was not synonymous with an insurance company paying for the defense of its insured. *Id.* Because there was no evidence that the insurer and the plaintiff were working together to defraud the defendant, or that the insurer was the real party in interest, the panel rejected the defendant's collusion argument. *Id.*

An Eastern District of California tax case noted *Mort*, *In re Tiffany*, and *First Federal* and concluded, at least under "more liberal California law," "instigation and control of the litigation by the insurer is not the sort of 'collusion' as would defeat relief." *Bedrock Fin., Inc. v. United States*, 2012 WL 5499403 *6-7. Enforcing contractual rights and obligations to "obtain an equitable remedy authorized by law" is not collusion. *Id.* Even assuming the title insurer here controls this litigation, this does not change the equitable subrogation analysis. While the result would differ under Indiana law, the "collusion" referred to in *Mort* refers to more than simply paying for and directing litigation. There is no evidence Boresek and the insurer acted in collusion to defraud anyone.

Although I conclude Boresek may proceed with the equitable subrogation claim, questions of fact preclude summary judgment. On this record, it is impossible to determine whether Boresek acted in a commercially reasonable manner in relying on the preliminary title

report. Boresek submits a declaration of Martin Hall, who works for Advanced Investment

Company (AIC). AIC investigated the loan on Beresek's behalf. Hall states:

> [I]t is a commercially reasonable and common industry practice, and a specific
> practice of AIC, to rely upon title companies to issue an accurate preliminary title
> report, and to follow the instructions issued by AIC and/or its lenders in order to
> assure that only approved liens of record remain on the title of the property that is
> to serve as collateral security for loans.

Hall Decl. ¶ 3, ECF No. 34, 2.

It is undisputed that the Bussmans informed Boresek of both original loans. It is also

undisputed that the title report did not show the larger of the two original loans. Although Hall

states it is a common industry practice "to rely upon title companies to issue an accurate

preliminary title report," Boresek had information demonstrating the preliminary title report was

in fact inaccurate. On this record, questions of fact preclude concluding, as a matter of law, that

Boresek acted in a commercially reasonable manner.

**III. Equitable Marshaling**

> The equitable remedy of marshaling securities, with that of marshaling assets,
> depends upon the principle that a person having two funds to satisfy his demands
> shall not, by his election, disappoint a party having but one fund. The general rule
> is, that if one creditor, by virtue of a lien or interest, can resort to two funds, and
> another to one of them only, as for example, where a mortgagee holds a prior
> mortgage on two parcels of land, and a subsequent mortgage on but one of the
> parcels is given to another, the former must seek satisfaction out of that fund
> which the latter cannot touch. If, therefore, the prior creditor resorts to the doubly
> charged fund, the subsequent creditor will be substituted, as far as possible, to his
> rights.

*Comm. Bank v. Jones*, 278 Or. 647, 679 (quoting *Pomeroy's Equity Jurisprudence* 1062-63 (5th

Ed. 1941) (internal citations omitted)). Even if Boresek is entitled to equitable subrogation,

Boresek is only placed in the shoes of the creditor it paid off. As Boresek loaned the Bussmans

around $250,000, but the paid off loan was only around $170,000, equitable subrogation will not cover Boresek's entire loan.

Oregon follows the "basic principle of equity that where a senior creditor has recourse to two funds and a junior creditor has recourse to but one of them, the senior creditor must seek to satisfy itself first out of the fund in which the junior creditor has no interest." *Id* at 678. For marshaling to apply: 1) there must be at least two creditors of the same debtor; 2) there are two funds that belong to the same debtor; 3) the senior creditor alone has an interest in both funds; and 4) neither creditor nor any third party will be prejudiced by the marshaling order. *In re Luby*, 89 B.R. 120, 125 (D. Or. 1988).

Even assuming the United States has waived sovereign immunity as to equitable marshaling, questions of fact preclude summary judgment. At this point, it is unclear if marshaling would prejudice the Bussmans or the United States. Nothing in the record indicates the FSA is seeking to foreclose its interest at this time, or if a ruling for Boresek on this claim would influence the FSA's decision regarding foreclosure or rescheduling of the loans. Additionally, as of May 2014, the Bussmans owed the FSA over $400,000. An exhibit provided by the FSA indicates the cranberry farm parcel is worth approximately $350,000. As questions of fact exist as to whether defendants will be prejudiced from equitable marshaling, summary judgment on this claim is DENIED.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

## CONCLUSION

Because the United States has waived sovereign immunity as to Boresek's claim of equitable subrogation, plaintiff's motion for summary judgment, ECF No. 29, is GRANTED in part. Defendants' motions, ECF No. 27 and 35, are DENIED. Within fourteen days, the parties shall contact Charlene Pew at 541.431.4105 with proposed dates for a status conference.

IT IS SO ORDERED.

DATED this _23_ day of September, 2014.

Michael McShane
United States District Judge