IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

F.J. BORESEK, TRUSTEE OF THE F.J.
BORESEK TRUST,

        Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, FARM SERVICE
AGENCY; CHRISTIAN BUSSMANN and
DEANA BUSSMANN.

        Defendants.

_____

Case No. 6:12-cv-02138-MC

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

MCSHANE, Judge:

    Following partial summary judgment[1] in favor of the plaintiff, F.J. Boresek, I held a court

trial on February 9-10, 2015, and March 4, 2015. The parties presented lay and expert witness

testimony to determine whether Boresek's ignorance of the FSA lien on the property of Christian

---

[1] *See* ECF No. 47.

1 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Bussmann and Deana Bussmann ("the Bussmanns") held by the United States Department of Agriculture, Farm Service Agency ("FSA") was due to inexcusable negligence and whether Boresek's reliance on a defective preliminary title report was commercially reasonable. For the reasons that follow, I conclude that Boresek's ignorance of the FSA lien was due to inexcusable negligence, that Boresek's reliance on the defective preliminary title report was not commercially reasonable, and that the FSA would be prejudiced by equitable subrogation. The issue of marshaling is not ripe for adjudication at this time. Below are my findings of fact and conclusions of law. Fed. R. Civ. P. 52(a).

## FACTUAL FINDINGS

In 2007, Boresek lent the Bussmanns $250,000, secured by the Bussmanns' 10.5-acre parcel of land. This lot contained the Bussmanns' home and 10 acres of cranberry bogs. In completing this transaction, Boresek, through his agent Advanced Investment Corp. ("AIC"), bought out two first-position liens held by Sterling Savings Bank ("Sterling Bank"). Unbeknownst to Boresek, the FSA had a second-position lien on the Bussmanns' home property and a first-position lien on a separate 54 acre parcel owned by the Bussmans. These liens secured $440,000 in loans from the FSA to the Bussmans. When Boresek paid off the Sterling Bank loans, the FSA moved up to first-position on the house property, while Boresek ended up with a second-position lien.

I find Marty Hall, the mortgage broker for AIC, to be generally credible. Hall is experienced in the field of hard money lending, but he is not experienced in the field of agricultural loans. Hall testified that he has only made one prior loan to a cranberry farmer, which took place many years ago. Trial Transcript ("Tr.") 57. Hall added that he had never encountered the FSA before, did not know what the initials FSA meant, and did not think that the

2 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

FSA debt meant more or less than any other kind of debt. Tr. 364. Hall did acknowledge that the Bussmanns were clearly in the agricultural business, Tr. 61, and Hall personally drove by the property, which featured cranberry bogs. Tr. 57. Nevertheless, Hall testified that he merely assumed the $440,000 FSA loan was secured by other farming operations. Due to Hall's lack of familiarity with the FSA, the method in which the FSA secures its loans, and with farm loans in general, I give Hall's testimony little weight as it pertains to the duty of care for an agricultural loan.

Specifically, I find that AIC did none of the following: verify the Bussmanns' income, review the Bussmanns' tax returns, review the Bussmanns' bank statements, meet with Mrs. Bussmann, review the Bussmanns' farm operations, ask the Bussmanns about the FSA, call the FSA at any point before making the loan, make any effort to determine what the FSA was, investigate the figures on the Bussmanns' financial statement, obtain an appraisal of the Bussmanns' property, or contact a credible real estate agent to perform a comparative market analysis ("CMA").[2] I find that AIC's due diligence rested almost entirely on the following: a title policy that followed a preliminary title report AIC knew to be incorrect; a CMA performed by a friend of a friend of Mrs. Bussmann who Hall never met and whose experience in the area of farms or marketing farms Hall was unaware; and a brief drive-by of the property by Hall himself, after which Hall decided to discount the valuation of the CMA. Hall testified that his primary concern was getting title assurance from Ticor Title ("Ticor") and that the rest of the debts "were of far less concern to me." Tr. 365.

---

[2] I recognize some information, such as a borrower's tax returns, are less import to hard money lenders such as Boresek. The parties agree that the value of the collateral is the most important piece of information for a hard money lender. The plaintiff's mantra throughout trial that "I was only concerned about the value of the collateral" does not excuse them from due diligence.

I give the CMA report little weight. The CMA is based on properties that have little to no resemblance to the Bussmanns' property, other than being in the same general geographic area.[3] Furthermore, the expertise of the agent who produced the CMA was never established, and the CMA is based on asking prices rather than closed sales. *See* Ex. 16. The CMA valued the Bussmanns' 10.5-acre property at $889,000, while the FSA recently valued the Bussmanns' equipment, 10.5 acre parcel, and 54 acre parcel together at $718,600. Tr. 227. In fact, the record is insufficient to establish at all the actual value of the Bussmanns' 10.5-acre parcel.[4] I also give very little weight to the discounted figure of $550,000 that Hall assigned to the 10.5-acre parcel. Hall based that figure on a brief drive-by of the property and the nearly worthless CMA. Hall admitted he knew nothing of the farming operation that he observed from the window of his moving car.

As the value of collateral is the most important aspect of a hard money loan, Hall certainly could have done more to learn the value of the Bussmans' home lot. Hall's practice is to make sure collateral is worth at least twice the value of the loan. Although Hall discounted the CMA to $550,000, this figure may as well have been plucked out of thin air.

I give Hall's testimony little weight with regard to the commercial reasonableness of the preliminary title report. Hall testified that the idea of calling the title company when he received a preliminary title report that he knew to be inaccurate did not occur to him even though he considered the preliminary title report to be very important. Tr. 85, 87. Furthermore, Hall testified that he did not have an opinion as to whether the title company or escrow agent would want to know that there is a problem with the preliminary title report. Tr. 91-92.

---

[3] As noted by the FSA, one of the comparables is a nearly 600 acre ocean view property, with pastures and timber suitable for raising cattle and horses. Another comparable is a 50-99 acre property with an 80-head animal feeding operation.

[4] A 1998 FSA report valued the 10.5-acre property at $327,500. *See* Trial Ex. 82 at 1.

4 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

In contrast, the escrow agent who facilitated the Boresek transaction, Diane Schafer, testified that she would expect a lender to inform her of a defective preliminary title report so that she could notify the title officer to do more research. Tr. 267. The FSA expert Denise Johnson testified that she has called title companies numerous times in the past to inform them of an inaccurate preliminary title report, and she would always do that in order to allow the title company to catch other potential errors. Tr. 296-97. Johnson testified that she had never in 36 years put a preliminary title report into her file that she knew to be inaccurate. Tr. 326. The other FSA expert, Dennis Lynch, testified that one should always alert the title company or the escrow agent to a defect in the preliminary title report. Tr. 333. Lynch stated that the failure to alert the title company precludes the possibility of correcting other unknown defects. Tr. 355-56. In light of the importance lenders place on preliminary title reports, I find the FSA experts and the escrow officer's testimony to be more convincing than that of Mr. Hall.

I also give the FSA experts' testimony more weight than Boresek's expert, Donald Burdick. Burdick agrees that "the private lender is usually much more focused on the security of the collateral value[,]"[5] and Burdick testified that the value of the collateral is the most important factor for a hard money lender to investigate. However, Burdick's due diligence analysis relied heavily on the baseless CMA performed by a friend of a friend of Mrs. Bussmann.[6] Given that Burdick admits a hard money lender must perform greater due diligence with respect to the value of the collateral, I give little weight to his testimony that Boresek satisfied that higher burden by performing a brief drive-by of the property and asking the prospective borrowers to provide what turned out to be a worthless CMA.

---

[5] *See* ECF No. 59, Plaintiff's Expert Report, p. 2.
[6] "I consider this CMA to be particularly important for the original underwriting of this loan." *Id.* at 3.

5 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

I also discount Burdick's opinion because he gave "no weight" to exhibit 49, the unsigned list of the Bussmans debts and assets. Burdick gave exhibit 49 "no weight" because it was unsigned. But any lender, hard money or otherwise, is going to look at any information available when evaluating collateral and risk. I agree with Lynch that "if you were concerned about it, you would go in and you would look at that debt and you would try to determine where that debt is secured. You'd make a reasonable inquiry into the borrower as to that schedule of debt that doesn't show having any security associated with it. It's a listing of liabilities." Tr. 332. Signed or not, I agree that exhibit 49 should have raised red flags. Tr. 288.

## CONCLUSIONS OF LAW

A party bringing an equitable subrogation claim admits their title is subordinate but argues equity demands the court place them in front of the party with priority. In *Dimeo v. Gesik*, 164 Or. App. 567, 571 (1999), the court provided a concise description of the doctrine of equitable subrogation:

> If the holder of a mortgage takes a new mortgage as a substitute for a former one, and cancels and releases the latter in ignorance of the existence of an intervening lien upon the mortgaged premises, although such lien be of record, equity will, in the absence of the intervening rights of third parties, restore the lien of the first mortgage and give it its original priority.

*Id*. (quoting *Pearce v. Buell*, 22 Or. 29 (1892) (internal brackets omitted)). The court noted equitable subrogation only applies when "the lender proves that it was ignorant of the existence of the intervening lien and that its ignorance was not a result of inexcusable negligence." *Id*. at 571.[7]

I conclude that Boresek's reliance on an erroneous preliminary title report was not commercially reasonable. I also conclude that Boresek's failure to discover the FSA lien was due

---

[7] For a more thorough discussion of equitable subrogation, see my September 23, 2014 opinion granting in part Boresek's motion for summary judgment. 2014 WL 4792587 at *3-5 (D. Or.)

to inexcusable negligence because Boresek failed to meet the higher standard of care for a hard money lender with respect to the value and security of the collateral. Finally, I conclude equitable subrogation is not appropriate here as it would prejudice the FSA.

## I. Commercial Reasonableness

The parties agree that it is commercially reasonable for a lender to rely on an accurate preliminary title report. Here, Hall relied on a preliminary title report he knew to be inaccurate. Additionally, Hall never alerted the title company of the known inaccuracies. This failure deprived the title company of the opportunity to discover the FSA lien.

Boresek contends that there was no need to alert the title company to the missing Sterling Bank lien in the preliminary title report because AIC instructed the escrow agent and title company to provide a title policy that guaranteed a first-position lien. Therefore, even if AIC had alerted the title company and received a supplemental title report, AIC's final instructions would have been the same.

This argument is unpersuasive. That scenario assumes that the title company would find the missing lien before closing the transaction, despite not having found the error on the preliminary title report. That scenario also assumes that where there is one missing lien, there are not others, which in this case there clearly were. All the witnesses in this case agree that preliminary title reports are important and that lenders rely upon them. With the sole exception of Hall, all the witnesses agree that when a lender discovers an error on a preliminary title report, the lender should immediately notify the title company or the escrow agent. Based on that industry standard, I conclude that Boresek's reliance on an erroneous preliminary title report without informing the title company of the missing lien was not commercially reasonable.

7 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Boresek's response argument, which is more persuasive, is that the failure to notify the title company of the Sterling Bank lien was immaterial because the FSA lien was not on Ticor's title plant in the first place. Therefore, even if AIC had notified Ticor, any amended preliminary title report would still not have included the FSA lien. This argument fails for two reasons. First, the failure to notify Ticor of the error precluded all possibility of Ticor going to the county records and discovering the missing FSA lien. As noted by the FSA expert witness, the objective of a title plant is to mirror the county records. Tr. 356. Notifying a title company of an incorrect preliminary title report informs the company that its plant may well be out of sync with the county records. In such cases, it is certainly possible that the title company will actually go and examine the county records. Tr. 356. Hall's failure to notify Ticor of known inaccuracies made that prospect impossible.

Second, whether Boresek's actions upon receiving the inaccurate preliminary title report were commercially reasonable does not depend on whether a subsequent title search would have revealed the FSA lien in this particular instance. True, the FSA lien happened to not be in Ticor's title plant. But whether Hall acted in a commercially reasonable manner is an objective standard. And I conclude that knowingly relying on an inaccurate preliminary title report is not commercially reasonable. Boresek's objectively unreasonable reliance on an erroneous preliminary title report does not suddenly become commercially reasonable just because Ticor's title plant turned out to be defective in this instance.

Boresek's failure to further investigate the erroneous preliminary title report is one example of the multiple failures of due diligence in this case that amount to inexcusable negligence. Even if Boresek's reliance on the preliminary title report had been commercially reasonable, which it was not, equitable subrogation would not be appropriate.

8 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

**II. Inexcusable Negligence**

      Boresek insists that AIC's inadequate valuation of the Bussmanns' property based on a defective CMA is irrelevant to the issue of inexcusable negligence because the CMA had nothing to do with the missing FSA lien. I disagree. Both parties' experts agree that a hard money lender has a higher duty of care with respect to the value and security of the collateral. The FSA expert Johnson testified that a hard money lender should pay "extreme" attention to the collateral because that is what the lender is lending against. Burdick relied heavily on the CMA in his analysis and testified that the most important factor for a hard money lender is the value of the collateral. Hall himself testified that he did not anticipate any problems because his discounted $550,000 valuation of the property more than covered the $250,000 loan. Although Boresek insists that the $250,000 loan was "an excessive discount from $889,000,"[8] I give no weight to an "excessive discount" of a baseless figure that I have already disregarded. As discussed above, Hall may as well have picked the $550,000 number out of a hat.

      Boresek had a high duty of care with regard to the value and security of the collateral. Hall testified numerous times that his primary concern was whether the value of the property was enough to cover the loan, and the record reflects that AIC did not investigate the other aspects of the Bussmanns' farm operations or income. The due diligence in this case amounts to reliance on the Bussmanns' loan applications and the title policy, irrespective of the other debts and red flags.[9] Boresek's argument is essentially that unless a hard money lender has actual knowledge

---

[8] *See* ECF No. 84, Plaintiff's Written Closing Arguments, p. 10.
[9] *Id.* at 8.

9 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

of a senior lien, the lender cannot be negligent in relying on a title policy that promises a first-position lien in an amount less than the perceived value of the property.[10]

That cannot be the higher standard of care related to the value and security of collateral for a hard money lender making an agricultural loan. Nearly all lenders obtain title insurance. They also to some degree investigate income, tax returns, cash flow, financial statements, credit reports,[11] professional appraisals, meet with the prospective borrowers, and find out who else has made loans to the prospective borrowers. Boresek did none of those things. Boresek looked at two loan applications and a meaningless CMA, did not see an FSA lien, and then obtained a title policy. It is doubtful whether that even satisfies the duty of care with respect to the collateral for an ordinary lender, much less a hard money lender whose entire investment depends on the value and security of the collateral.

I conclude that, in addition to the inadequate valuation of the Bussmanns' property, Boresek was inexcusably negligent in ignoring the direct evidence of competing loans listed on the Bussmanns' financial statement.[12] Much has been made of the fact that the financial statement was unsigned, but Hall testified that the absence of a signature did not affect how much weight he gave the financial statement. Instead, Hall testified that he was not concerned with the other debts, and merely assumed that they were secured elsewhere. That assumption does not reflect a higher standard of care with respect to the collateral. The Bussmanns' financial statement lists $1,465,300 in liabilities, $440,000 of which is an FSA loan. The Bussmanns did not have other assets that would cover a $440,000 loan, much less $1,465,300, and FSA loans

---

[10] *Id.* at 10 ("Being that Boresek and AIC believed Boresek's trust deed to be in first position, then so long as the value of the Residential Property exceeded $250,000 . . . Boresek's equity position was protected.")

[11] To the extent AIC did take the Bussmanns' credit report into consideration, Hall testified that it was "not stellar." Tr. 72. This should have prompted additional inquiries, not less.

[12] *See* Ex. 49.

10 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

are almost always secured by something. Any lender familiar with agricultural loans would know what the initials FSA stand for and that the FSA does not ordinarily make unsecured loans.

Hall lacked a sufficient understanding of farm property to adequately value and understand the collateral and its associated debts. Hall did not know what the FSA was, and he made no effort to find out. Hall's lack of familiarity with the FSA and farm loans in general does not constitute excusable negligence because this was an agricultural loan. The failure to simply ask the Bussmanns what the FSA was does not meet the higher standard of care with respect to the collateral. Additionally, the Bussmanns' ignorance of the FSA lien in their loan application does not excuse Boresek's ignorance of the FSA lien. Hall testified that borrowers are often confused and present incomplete information on their loan applications. Tr. 95. A hard money lender does not meet the high standard for valuing and securing collateral by relying on the borrowers' representations on a loan application when the lender knows that loan applications are frequently inaccurate.

I find the FSA experts persuasive on this point. Diane Johnson testified that anyone involved in agricultural loans should know and understand FSA loans. Tr. 315. The FSA information in front of Hall should have raised red flags as the FSA security did not match up with the FSA collateral. Tr. 314, 318-19. Hall should have questioned any $440,000 loan under these circumstances. Tr. 315.

Dennis Lynch testified that given the finances of the Bussmans, they could not possibly borrow $1,400,000 on an unsecured basis. Tr. 332. I agree that Hall should have done more to ascertain whether any other collateral interfered with Boresek's security interest. Tr. 332. Hall never asked the Bussmans about the FSA debt. Hall never contacted the FSA regarding the debt. Instead, he merely assumed the FSA debt was secured with other farming operations. I agree

11 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

with Lynch that "from the meager elements of the file and the financial disclosures there, the means to determine that FSA's debt was secured and how it was secured were available to Boresek." Tr. 334.

In processing this loan, AIC had numerous opportunities to inquire further about the Bussmanns' outstanding debts, but AIC only concerned itself with obtaining a title policy that guaranteed its loan. AIC involved itself in an agricultural loan with little to no familiarity in the area of agricultural lending, and AIC assumed the risk of competing liens when it failed to perform any due diligence with respect to the Bussmanns' other liabilities. Unflinching reliance on an inaccurate title report and a loan application in the face of numerous red flags is not excusable negligence, so equitable subrogation is not appropriate based on the facts of this case.

## III. Prejudice

Even if Boresek acted in a commercially reasonable manner and was not inexcusably negligent, equitable subrogation would prejudice the FSA. The FSA restructured the Bussmanns' loan in 2009 with the correct understanding that the FSA held a first-position lien on the property. The restructuring of the loan reduced the interest rates from 5% to 2.5% on one loan and from 5% to 4.5% on another, and extended the repayment term. The FSA cannot now go back in time and change the terms of the loan modification.

Boresek's response that the FSA did not establish what the terms of a hypothetical restructuring would have been with a second-position lien is unavailing. Perhaps the FSA would not have capitalized the interest if the FSA knew it did not have a first-position lien to secure the capitalized interest. Perhaps the FSA would have foreclosed on the 54-acre parcel. The FSA was never in a position to evaluate a restructuring of the Bussmanns' debt with a second-position

lien, and the FSA cannot now be expected to produce a detailed loan modification plan six years after the fact.

Even if Boresek assumed the exact position of the Sterling Bank loans, on the same terms, the FSA cannot undo the 2009 loan modification it undertook on the correct assumption that it had a first-position lien on the Bussmanns' property. This Court cannot grant equitable subrogation without prejudicing the FSA in some way.

## IV. Equitable Marshaling

The issue of marshaling is not ripe for adjudication. The testimony was that FSA foreclosure proceedings can take years to complete. Much can change in that time, should it ever come. Cranberry prices can go up or down. Land prices on the coast can rise or fall. The Bussmans may settle their antitrust lawsuit against Ocean Spray, allowing them to satisfy all their debts. I am not in a position to issue a prospective ruling as to what the parties should do at some future date based on facts that could be markedly different from the ones currently before the court.

## CONCLUSION

Based on the lay and expert testimony in this case, I conclude that Boresek's reliance on a defective preliminary title report was commercially unreasonable, and Boresek's failure to discover the FSA lien was due to inexcusable negligence. I also conclude that the FSA would be prejudiced by equitable subrogation. As a result, equitable subrogation is inappropriate. The marshalling issue is not ripe for adjudication.

DATED this 9th day of June, 2015.

_____/s/ Michael J. Mcshane_____
Michael J. McShane
United States District Judge

13 – FINDINGS OF FACT AND CONCLUSIONS OF LAW